**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
ROMA TORRE, KRISTEN SHAUGHNESSY,      :
JEANINE RAMIREZ, VIVIAN LEE and          :
AMANDA FARINACCI,                                    :        Civil Action No.:
                                                                       :
                           Plaintiffs,                       :
                                                                       :        **COMPLAINT**
                v.                                                  :
                                                                       :
CHARTER COMMUNICATIONS, INC. d/b/a  :        **Jury Trial Demanded**
SPECTRUM,                                                  :
                                                                       :
                           Defendant.                     :
-------------------------------------------------------------- X

Plaintiffs Roma Torre, Kristen Shaughnessy, Jeanine Ramirez, Vivian Lee and Amanda

Farinacci allege against Defendant Charter Communications, Inc. ("Charter") as follows:

## PRELIMINARY STATEMENT

1.       Plaintiffs Roma Torre, Kristen Shaughnessy, Jeanine Ramirez, Vivian Lee and

Amanda Farinacci are distinguished and award-winning on-air talent on Charter's New York

One ("NY1") news channel covering the New York metro area.  They have collectively worked

at NY1 for more than 100 years – devoting their careers and dedicating their lives to New York

journalism and the success of NY1.  Despite these tremendous efforts and their indisputable skill,

NY1 has blatantly marginalized them and cast them aside in favor of younger women and men,

in a transparent effort to reshape the appearance of the on-air talent.

2.       Sadly, it is hardly a novel occurrence that the media fails to showcase professional

older women in on-air positions, instead favoring younger women and men.  The *New York*

*Times* recently published an article titled "The Fight to Be a Middle-Aged Female News Anchor:

There is no fighting sexism on television without fighting age discrimination along with it,"[1]

which highlighted the experiences female television journalists have had to – and continue to –

face in the workplace.  The article focused on the discrimination faced by one woman, which

was summarized as follows:

> My gender and age stamped me with a bull's-eye I couldn't shed
> despite decades of dedication, journalism awards, public respect
> and popularity.  [T]he message to women journalists is loud and
> clear:  Don't make trouble, don't stick up for other women, and
> whatever you do, don't get old.

This poignant quote could have just as easily come from Ms. Torre, Ms. Shaughnessy, Ms.

Ramirez, Ms. Lee or Ms. Farinacci, or doubtlessly by many other older female television

journalists throughout the country.[2]

---

[1]     Available at: https://www.nytimes.com/2019/03/11/opinion/meredith-kalodimos-age-discrimination.html.  Even more recently, the *New York Times* published another article on age discrimination more broadly, titled "New Evidence of Age Bian in Hiring, and a Push to Fight It."  *See* https://www.nytimes.com/2019/06/07/business/economy/age-discrimination-jobs-hiring.html

[2]     This form of discrimination has been identified in numerous articles and filed cases.  *See* e.g. "A TV reporter in her 40s was twice passed over for younger applicants.  So she sued," *Washington Post*, Sept. 27, 2017; "An Age-Old Problem:  TV newswomen say discrimination persists.  It's just harder to prove," *Broadcasting & Cable*, Mar. 16, 2018; "Beloved Nashville Anchor Sues Meredith for Age Discrimination: In 33 years, Demetria Kalodimos broke news and won awards. She also got old," *Bloomberg*, Dec. 10, 2018; "The Hypersexualization of Female News Broadcasters Proves Sexism is Alive and Well," *Women's Media Center*, Jan. 17, 2016; "When Women are Too Old to Appear on TV," *The Guardian*, Feb. 4, 2010; "KMBC said I was too old and too ugly.  Newswomen today are still fighting discrimination," *Kansascity.com*, Mar. 16, 2019; "Age And the Anchor-Woman," *Washington Post*, Aug. 2, 1983; "AGE DISCRIMINATION ON TV: 10 Anchors Who Were Replaced By Younger Women," *Business Insider,* Aug. 8, 2012; "Closing the TV-Guest Gender Gap," *The Atlantic*, Mar. 3, 2015; "Demetria Kalodimos hits Channel 4 with age discrimination, gender bias lawsuit," *Tennessean,* Nov. 29, 2018; "Fired Channel 10 anchor Reginald Roundtree takes to radio to talk about termination," *Tampabay.com*, Feb, 12 2019; "Former CBS Miami anchor Michele Gillen files age and gender discrimination suit," *South Florida Sun Sentinel*, Sept. 20, 2018; "Former KCTV-5 Anchor's Age Discrimination Lawsuit Can Proceed, Judge Rules," *kcur.com*, Aug. 23, 2018; "Former KCTV-5 news anchor Karen Fuller settles age and discrimination lawsuit," *The Kansas City Star*, Dec. 19, 2018; "It's Almost Impossible to Be a Mom in Television News," *The Atlantic*, Dec. 4, 2018; "Former CBS4 reporter Gillen accuses station of age and gender

3.     So concerning is this form of discrimination that The Association of National Advertisers ("ANA") has spearheaded a movement it refers to as the #SeeHer initiative,[3] with an advisory board including accomplished female professionals such as Katie Couric, Geena Davis, Laura Brown, Lisa Borders and Jennifer Rudolph Walsh.  #SeeHer is a gender equality campaign geared towards "creating a world in which every woman and every girl sees themselves as they really are in advertising and media."  This effort seeks to help ensure that the media and advertising industries provide an accurate depiction of women, rather than an environment in which every woman portrayed on screen is young.  As stated by the *New York Times* article:

> An underappreciated aspect of sexism in the workplace is age discrimination, and it operates in many places.  But one of the places where it's most visible – where we can all #SeeHer getting aged out – is TV news . . . It is impossible to accurately reflect women in the media when women in the TV news business are punished for getting older.  Because if you can't #SeeHer – well, we know what happens then.

4.     Ms. Torre, Ms. Shaughnessy, Ms. Ramirez, Ms. Lee and Ms. Farinacci are all victims of an environment at NY1 that is emblematic of the need for *#SeeHer* intervention. Ever since NY1 was taken over by Charter in 2016, Plaintiffs' then-blossoming careers have wilted – namely, their on-air time has been dramatically reduced, anchoring opportunities have disappeared, prime reporting roles have been taken away and promotional efforts have vanished. All these opportunities which have been snatched from Plaintiffs have been distributed to numerous younger women and men with substantially less experience.

5.     Ms. Torre, Ms. Shaughnessy, Ms. Ramirez, Ms. Lee and Ms. Farinacci have issued numerous internal complaints regarding this mistreatment both through management and

---

discrimination suit," *Miami Herald*, Sept. 18, 2018; "NBC News, Comcast Hit With Age-Discrimination Lawsuit by Reporter," *thewrap.com*, Jul. 10, 2014; "Are middle-aged local anchorwomen a target for downsizing?," *Baltimore Sun*, Jul. 29, 2011.

[3]     Available at: https://seeher.com

human resources channels, but these complaints have either not been taken seriously or been outright ignored, and have only led to retaliation and further mistreatment.

6.      Unfortunately, the widespread acts of discrimination which have marginalized Ms. Torre, Ms. Shaughnessy, Ms. Ramirez, Ms. Lee and Ms. Farinacci are the predictable results and manifestation of a company completely dominated by men.  Charter's own website[4] broadcasts that only two of the 19 people it considers part of "Company Leadership" are women. Of the 14 members of the Board of Directors, there is only one woman (notably, she is not a chair of any committee).  The top three leaders in the news department at NY1 since the merger are also all men (Michael Bair, Dan Ronayne and Anthony Proia – each described below).

7.      It is not surprising that a company without female leadership acquiesces to a workplace where discrimination thrives and fails to take appropriate measures to ensure that these issues are taken seriously and appropriately addressed when raised.  In such an environment, practically devoid of female leadership, it is not shocking – though still unacceptable – that women such as Ms. Torre, Ms. Shaughnessy, Ms. Ramirez, Ms. Lee and Ms. Farinacci are so harshly mistreated.

8.      Recently, on April 15, 2019, Bill Ritter, a 7-time Emmy award winning New York journalist, who anchors ABC-New York's *Eyewitness News* and acts as a correspondent for *20/20*, tweeted:

> 1 reason for @ABC7NY success is staying power of our reporters. We rely on familiar faces, talented storytellers to bring us the news that matters.  Like @staceysager7 who grows wiser but never older!  Happy work-iversary Stace!  Where would we be w/out u?

9.      Ms. Sager is 52 years old.  Clearly this sentiment is not shared at NY1, where Ms. Torre, Ms. Shaughnessy, Ms. Ramirez, Ms. Lee and Ms. Farinacci's decades of staying power

---

[4]      Available at:  https://ir.charter.com/corporate-governance/company-leadership

has been rendered meaningless and where "older" talent is viewed as a handicap, not as an attribute that is accompanied by wisdom.

10.     Furthermore, Ms. Torre, Ms. Shaughnessy, Ms. Ramirez, Ms. Lee and Ms. Farinacci are not the only older women at NY1 to have recently raised these concerns.  In late 2018, former video journalist Marisol Seda-Lourido (age: ~51) filed a federal action also alleging similar forms of age and gender discrimination at NY1.  See Seda-Lourido v. Charter Communications LLC, No. 18-cv-10340 (S.D.N.Y. filed Nov. 7, 2018).

11.     Ms. Lourido alleged discriminatory bias towards her "because she is an older woman and that would prevent her from rising to a full-time reporter."  Id. at ¶13.  Alleged discriminatory comments by Ms. Lourido's boss included "'acabada' which translates roughly to 'done' and 'old bag'" and that he "wanted a young female with a mini-skirt for a different role within the newsroom."  Id.  Ms. Lourido alleged – similar to Plaintiffs – that she was "removed from her regular assigned hours to help onboard the younger and less experienced male hires to the roles she was not given."  Id. at ¶21.  Ms. Lourido complained to human resources that this constituted discrimination, yet her complaints were dismissed as unfounded.  Id. at ¶23.

12.     As demonstrated in the public record, NY1 forced Ms. Lourido to litigate her claims in a private and confidential forum so that, upon information and belief, the evidence of discrimination and retaliation would be shielded from public-view.  As a news organization, which promises to "empower New Yorkers with the information they need to make decisions,"[5] this effort to shield precisely what happens in New York at NY1 is deplorable.  NY1 cannot ask the public to believe that it is genuinely concerned with "empower[ing] New Yorkers with

---

[5]     Available at: https://www.ny1.com/nyc/all-boroughs/about-us/staff-profiles

information" and then fail to provide New Yorkers with a fundamental level of transparency as to what happens in its own newsroom.

13.     Defendant's conduct constitutes unlawful discrimination and retaliation in violation of the Title VII of the Civil Rights Act of 1964, *42 U.S.C. §§ 2000e et seq.* ("Title VII"), the Age Discrimination in Employment Act of 1967, *29 U.S.C. §§ 621 et seq.,* ("ADEA"), the Equal Pay Act, *29 U.S.C. § 201(d)(1) et. seq.* ("EPA"), the New York State Human Rights Law, *N.Y. Executive Law §§ 290 et seq.* ("NYSHRL"), the New York City Human Rights Law, *N.Y.C. Admin. Code §§ 8-101 et seq.* ("NYCHRL") and the New York Equal Pay Law, *N.Y.L.L. §194 et seq.* ("EPL").  Plaintiffs seek all available monetary and injunctive relief to remedy Defendant's unlawful, discriminatory and retaliatory employment practices.

## JURISDICTION AND VENUE

14.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship between Plaintiffs (residents of the States of New York and New Jersey) and Defendant (a corporation with its headquarters in the State of Connecticut) and this action involves a matter in controversy that exceeds the sum of $75,000.

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343, as Plaintiffs have asserted claims that arise under federal laws of the United States.  In particular, Plaintiffs have asserted claims under the EPA, and will also be asserting claims under Title VII and the ADEA following issuance of a Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC").

16.     This Court has supplemental subject matter jurisdiction over Plaintiffs' state and local law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to federal claims in this action such that they form part of the same case or controversy.

17.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

18.    Plaintiffs will be filing a charge and/or charges of discrimination with the EEOC as an administrative prerequisite to asserting claims under Title VII and the ADEA and will file an Amended Complaint to include claims under Title VII and the ADEA at the appropriate time.

19.    Following the commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

## PARTIES

20.    Plaintiff Roma Torre is an adult resident of Montclair, New Jersey.  Ms. Torre meets the definition of "employee" under all applicable statutes.  Ms. Torre is a current employee of Charter and has been an employee of NY1 for approximately 27 years.  Ms. Torre is 61 years old.

21.    Plaintiff Kristen Shaughnessy is an adult resident of Scotch Plains, New Jersey.  Ms. Shaughnessy meets the definition of "employee" under all applicable statutes.  Ms. Shaughnessy is a current employee of Charter and has been an employee of NY1 for approximately 24 years.  Ms. Shaughnessy is 50 years old.

22.    Plaintiff Jeanine Ramirez is an adult resident of Brooklyn, New York.  Ms. Ramirez meets the definition of "employee" under all applicable statutes.  Ms. Ramirez is a current employee of Charter and has been an employee of NY1 for approximately 23 years.  Ms. Ramirez is 49 years old.

23.     Plaintiff Vivian Lee is an adult resident of Brooklyn, New York.  Ms. Lee meets the definition of "employee" under all applicable statutes.  Ms. Lee is a current employee of Charter and has been an employee of NY1 for approximately 11 years.  Ms. Lee is 44 years old.

24.     Plaintiff Amanda Farinacci is an adult resident of Staten Island, New York.  Ms. Farinacci meets the definition of "employee" under all applicable statutes.  Ms. Farinacci is a current employee of Charter and has been affiliated with NY1 for approximately 19 years.  Ms. Farinacci is 40 years old.

25.     Defendant Charter is a publicly traded corporation on the NASDAQ exchange with a principal place of business located in Stamford, Connecticut.  Charter also does business under the name "Spectrum" and Charter owns, operates and manages NY1.  For all purposes herein, NY1 is treated as an extension of Charter.  At all relevant times, Defendant Charter and/or NY1 met the definition of "employer" under all relevant statutes.

**FACTUAL ALLEGATIONS**

I.      **BACKGROUND**

26.     NY1 was originally launched approximately 27 years ago on September 8, 1992.  It was conceived by Richard Aurelio (then-President of Time Warner Cable's New York City operation) who felt the city needed its own 24/7 news station devoted to the more than 20 million people in the metro-area.

27.     NY1 has since become a stalwart member of the New York news media.  In a time when cable news and its pervasive graphic displays became increasingly popular across the country, New Yorkers have gravitated towards NY1's less-frills coverage.

28.     Roma Torre, now 61 years old, was the first on-air "talent" hired by NY1 in 1992, and she remains there today.  However, all the Plaintiffs have devoted the bulk of their respective

careers to NY1 – Kristen Shaughnessy (50 years old) started in 1995; Jeanine Ramirez (49 years old) started in 1996; Amanda Farinacci (40 years old) started in 2000; and Vivian Lee (44 years old) started in 2008.

29.     To say Ms. Torre, Ms. Shaughnessy, Ms. Ramirez, Ms. Lee and Ms. Farinacci have had impressive journalistic careers at NY1 would be a drastic understatement.  They have received dozens of awards, honors and accolades for their excellence in journalism.  For years, NY1 recognized their contributions by providing them with numerous opportunities to advance and showcase their skills.  Unfortunately, that would all change.

30.     On May 18, 2016, Time Warner Cable merged with Charter, creating one of the largest television service providers in the United States.  Shortly thereafter, NY1 underwent a massive overhaul and restructuring in which numerous long-tenured, older employees (men and women) were terminated, including some well-known on-air personalities.

31.     In fact, in March 2017, the *New York Daily News* published an article titled "Bloodbath at NY1: Some of your favorite on-air staffers at New York news channel get the ax"[6] which reported that at NY1, "the plan is to replace expensive established talent with younger and cheaper talent."

32.     During this post-merger restructuring, approximately 40 long-time, older NY1 employees over the age of 40 were forced out,[7] while the layoffs barely impacted younger

---

[6]     Available at: https://www.nydailynews.com/entertainment/tv/bloodbath-ny1-spectrum-axes-longtime-staffers-article-1.3013693

[7]     Upon information and belief, this list includes: Shelley Goldberg, Neil Rosen, Valerie D'Elia, Budd Mishkin, Marc Weingarten, Neil Goldberg, Kevin Garrity, Dave Fleischer , Michael Chow, Doris Bergman, Sam Roberts, Donna Karger, Rob Lo Frisco, John Schiumo, Susan Jhun, Adam Balkin, Neimat Kerdany, Bernice Hirsch, Dan Jacobson, Yogi Colon, Howie Schlectman, Joanne Heller, Mary Shilling, Gerry Gallagher, Larry Rochman, Steve Paulus, Phil Andrews, Marc Nathanson, Tom Farkas, Wil Cruz, Leslie Hines, Jeremy Bitz, Robin Sanders, Judith Tolkow, Marc Bordon, Lan Trinh, Jeanne Yurman, Joya Dass and Wendy Gillette.

employees.  While Plaintiffs were spared from this layoff, they have since been forced to work in an environment that has become exceedingly hostile.

33.     In January 2017, Anthony Proia became NY1's News Director,[8] and later that year, in December 2017, Melissa Rabinovich became the Assistant News Director.  Together, Mr. Proia and Ms. Rabinovich have thrust a younger crew of talent into the most visible and coveted anchoring positions, created additional opportunities for these younger journalists at the expense of older talent and diminished Plaintiffs' roles across the board.

34.     Mr. Proia and Ms. Rabinovich have instituted changes to NY1's daily lineup to Plaintiffs' collective detriment, made modifications to the fill-in anchor hierarchy at the expense of Ms. Shaughnessy, Ms. Ramirez, Ms. Lee and Ms. Farinacci and have established numerous other practices which have marginalized Plaintiffs' careers and standing.

35.     Notably, at the same time Plaintiffs have been marginalized, younger women and men (nearly all of whom were hired by Ms. Rabinovich, whether when she was Assistant News Director or in her previous position as Executive Editor) have been provided expansive opportunities to showcase their talent and advance their careers, including Bree Driscoll (age: ~36), Shannan Ferry (age: ~26), Angi Gonzalez (age: ~37), Van Tieu (age: ~35), Lindsay Tuchman (age: ~27), Clodagh McGowan (age: ~ 32), Lydia Hu (age: ~ 34), Rocco Vertuccio (age: ~49), Matt McClure (age: ~38) and Anthony Pascale (age: ~44).

36.     Moreover, Mr. Proia and Ms. Rabinovich appear to be grooming literal "replacements" that track each of Plaintiffs' respective appearances and ethnic backgrounds.

---

[8]     Mr. Proia announced his resignation from NY1 on May 22, 2019.

37.     By way of example, while Ms. Shaughnessy is being marginalized, Ms. Driscoll (36 years old, and also Caucasian and blonde) has ascended, including being given a daytime daily anchor position.

38.     When Ms. Ramirez, who is Latina, needs someone to fill-in for her Sunday night anchoring role, the first person asked is Ms. Gonzalez (37 years old, also Latina).

39.     Ms. Hu (under 40), who is of Asian descent, has recently been asked to fill the 5a[9] Breaking News reporting shift, a role Ms. Lee filled for many years.

40.     Finally, Ms. Ferry (26 years old) who is white with light brown hair has received many of the fill-in anchor slots that once belonged to Ms. Farinacci, who is also white with light brown hair.  The below photographs reflect the aforementioned employees.



## II.     PLAINTIFFS

### A.     Roma Torre

41.     Ms. Torre – who is 61 years old and has two adult children – joined NY1 in 1992 as its *first* on-air hire, starting as a weekend anchor and three-day per week reporter.

---

[9]     In TV news nomenclature, "a" and "p" are used rather than "am" and "pm," respectively.

42.     Less than a year after she started, Ms. Torre began hosting *Inside City Hall* and simultaneously became the weekday morning anchor, replacing Brad Holbrook.

43.     Ms. Torre was also tapped to do NY1's theater reviews, given that she has a background in theater and previously started a theater company in Boston.

44.     Ms. Torre's reviews are widely quoted in the press and on theater marquees, which of course provides free advertising for NY1.

45.     In or around September 1997, after the mid-day anchor resigned, Ms. Torre requested to take that shift over, citing lack of sleep with two young children at home and late nights covering theater openings as some of her reasons for the request.

46.     At the time, NY1's management argued that the ratings for her morning show were very high but Ms. Torre insisted and she has been anchoring the mid-day shift ever since.

47.     Before Charter took over, Ms. Torre was seen on-air from 10a to 6p daily during weekdays (from 10a to 12p, she was seen alternating with morning anchor Pat Kiernan and from 4p to 6p, she was seen alternating with night anchor Lewis Dodley).  However, between 12p and 4p, Ms. Torre was on-air solo.  Taken together, during these years Ms. Torre occupied approximately six hours of on-air time per day.

48.     Ms. Torre has received an array of awards and recognitions.

49.     Even before she came to NY1, Ms. Torre had garnered more than 30 broadcasting awards while at News-12 Long Island.  Among her News-12 honors was an Emmy for covering the Avianca plane crash in 1990.

50.     Although NY1 does not submit anchors for awards nearly as often, Ms. Torre has picked up several broadcasting awards during her tenure, including a 1993 *New York Magazine*

"Best Of New York" selection for New York anchors and the 2003 Newswomen's Club of New York's Peggy Award for Broadcasting.

51.     Ms. Torre has received widespread recognition for her reporting on her colon cancer diagnosis, including a New York Press Club award and an Associated Press Public Service award nomination, in addition to numerous citations from municipal and private cancer organizations.

52.     Ms. Torre was nominated for two 2019 New York Emmy awards – the first in the category of Reporter, Commentator Editorialist and the second for her work on an episode of *OnStage* in the category of Arts Program.  Ms. Torre won the 2019 Emmy for Arts Program for her theater reviews, NY1's only newsroom Emmy.

53.     Needless to say, for a 27-year employee and one of the "faces" of NY1, Ms. Torre's annual reviews are similarly glowing.

54.     As recent examples, in 2016, Ms. Torre's review highlighted that:

> Roma had another solid year, contributing greatly in her role as daytime anchor and theater reviewer.  Roma also provided amazing work during our marathon election night coverage, exhibiting a polished and thoughtful counterpoint to and chemistry with her election co-anchor Errol Louis.

55.     Ms. Torre's 2017 review stated:

> Roma continues to be a huge player on the air at NY1 during the day, on Onstage and on Election Night.  Her depth of reporting and deep editorial knowledge makes her a huge asset.  She brings credibility to NY1 that is hugely important to us.

56.     Reviews aside, Ms. Torre's lengthy tenure and performance speak for themselves.

57.     Unfortunately, Ms. Torre's career has started to unravel.  A revamped weekly news schedule has thrust all of NY1's resources and marketing efforts towards younger women

and men.  As a result, Ms. Torre has lost substantial weekly air time to younger women and men and has been marginalized in innumerable ways, as described below.

**B.**   **Kristen Shaughnessy**

58.   Ms. Shaughnessy – who is 50 years old and has two children – started working at NY1 in 1995.  Ms. Shaughnessy has been a reporter and weekend anchor for virtually her entire tenure.

59.   Ms. Shaughnessy has acted as a Breaking News and Environmental reporter throughout her employment when she has not been behind the anchor desk and eventually also began creating, writing and shooting her own feature stories.

60.   From the start, Ms. Shaughnessy has held the morning weekend anchor position, totaling approximately 100 weekend anchor spots per year and more than 2,000 total spots over that span.

61.   During that time, due to her excellent ratings and clear talent behind the desk, NY1 progressively provided Ms. Shaughnessy with fill-in anchor opportunities (when a regular anchor happened to be sick, on vacation or otherwise unavailable) for mid-week shows.

62.   Over time, Ms. Shaughnessy became the primary weekday morning fill-in anchor, which she would generally cover several times per month.

63.   This fill-in role was particularly important as it provided Ms. Shaughnessy with air-time in front of NY1's largest audience and – presumably – put her in position for a more prime anchoring role if and when one opened up.

64.   Like Ms. Torre, Ms. Shaughnessy has received numerous recognitions.

65.   In 2017, Ms. Shaughnessy won Second Place at the New York State Associated Press Awards for *Remembering 9/11 – 15 Years Later*, a documentary she wrote and edited.

66.     In 2016, Ms. Shaughnessy was honored as one of Irish America's First Class of Top 50 Power Women in America.

67.     Ms. Shaughnessy has been named Top 30 Media by the Irish Voice and has twice been named to Irish America's Top 100 in America.

68.     Hofstra University once named Ms. Shaughnessy its Alumni of the Month.

69.     Ms. Shaughnessy's accomplishments have also been acknowledged internally, not only through a gradual increase in her role and compensation over two decades, but also through consistently laudatory reviews.

70.     For instance, in 2017, Ms. Shaughnessy's review stated:

> Kristen is a hugely valuable contributor to the newsroom capable of handling any situation that arises.  Kristen has also anchored this year more than she's ever done before.

71.     While Ms. Shaughnessy had anchored more in 2017 than she ever had before, as described below, that pattern would quickly come to an end.

72.     Moreover, as with the other Plaintiffs, Ms. Shaughnessy had already begun to feel marginalized following the Charter merger and had raised several complaints about the way she had been treated that year.

73.     In fact, Ms. Shaughnessy's complaints are reflected in her 2017 review, in which Ms. Rabinovich wrote that her "[p]reconceived slights should be put aside."  This statement is demonstrative of the dismissive manner in which internal complaints are handled at NY1.

**C.      Jeanine Ramirez**

74.     Ms. Ramirez – who is 49 years old and has three children – started at NY1 in 1996 as a weekend reporter.  By 2000, Ms. Ramirez was a full-time weekday Brooklyn reporter.

75.     Over the years, like Ms. Shaughnessy, Ms. Ramirez also picked up weekday fill-in anchor shifts.  Ms. Ramirez has been one of the primary weekday fill-in anchors for many, many years.

76.     Ms. Ramirez has filled-in for the morning show (when Ms. Shaughnessy is unavailable) or for many of the mid-day or evening anchor positions as needed.

77.     Eventually, Ms. Ramirez was given a seat behind the desk as an anchor on Sunday nights, a position she holds to this date.

78.     Ms. Ramirez has received countless awards for her journalism, including 2014 City & State Above and Beyond Award; 2015 Los Sures Community Recognition Award; 2015 National Hispanic Media Coalition Impact Award for Excellence in Journalism; 2015 Coney Island Alliance Community Award; 2017 Camp Brooklyn Community Service Award; 2018 New York Press Club award winner for Puerto Rico Recovers News Special; 2019 Emmy-nomination for Cultural/Historical News on Black Churches in Bedford-Stuyvesant; and the 2019 Women's History Month Award from Brooklyn Borough President Eric Adams.

79.     As with the other Plaintiffs, while Ms. Ramirez's tenure alone is demonstrative of her performance, her reviews bolster this point.

80.     By way of brief example, Ms. Ramirez's 2017 review states: "Jeanine is a mainstay of NY1, and several stories she did this year stand out . . . I enjoy collaborating with Jeanine and look forward to another productive year."

81.     Nonetheless, despite Ms. Ramirez's unquestionable talent and her two-decade-long commitment to NY1, post-merger she has been completely marginalized in favor of younger female and male talent.

82.     As described below, the mistreatment Ms. Ramirez has been subjected to only worsened when she had the courage to raise an internal complaint to Human Resources ("HR").

**D.    Vivian Lee**

83.     Ms. Lee – who is 44 years old and has two children – started at NY1 in 2008 as a weekend anchor handling the 9a shift (so that she was seen on-air from 12p to 6p).

84.     Ms. Lee was also a 5a Breaking News reporter from Wednesday through Friday.

85.     A Breaking News reporter is a coveted position as those reporters cover the most pressing daily stories leading to increased air time.  Breaking News is also the only reporter position that is supported with a dedicated cameraperson.

86.     In 2014, Ms. Lee returned from maternity leave in a part-time role and discontinued her Wednesday and Thursday reporting, but kept her Fridays.

87.     Ms. Lee was also a part of the regular rotation – with Ms. Ramirez and Ms. Shaughnessy – as a weekday fill-in anchor.

88.     In October 2017, based on her demonstrated anchoring skills, Ms. Lee was asked to host a show called *Spotlight New York* ("*Spotlight*"), which provided an "insider's" look at arts, culture and cuisine throughout the city.  *Spotlight* launched in December of that year, airing at 7p and 10p on Saturdays and Sundays.  Thereafter, Fridays became dedicated to taping the show rather than reporting.

89.     To name just a few of Ms. Lee's accomplishments over the years: in 2011, Ms. Lee broke the story of the U.S. Treasury Department's investigation into sale of fake gold bars in the Diamond District; in March 2013, Ms. Lee reported from Vatican City for several weeks leading up to Pope Francis' election and was the first reporter in the New York City market to break news of his election; in 2015, Ms. Lee was given the honor to anchor NY1's coverage of

Pope Francis' historic visit to Cuba and the U.S; Ms. Lee has also been awarded Mentor of the Year by The City University of New York's Asian American/Asian Research Institute.  Ms. Lee recently received a 2019 New York Emmy nomination for her work on *Spotlight* and the 2019 Lifetime Engagement Award from the Korean-American Family Service Center.

90.    Moreover, Ms. Lee has received excellent reviews.  For instance, in 2016, Ms. Lee's review stated:

> She is fully committed to the NY1 Product and it shows.  Vivian has always been comfortable in a live environment and has adapted well to the new directive that has live A blocks on the weekends. Going forward, Vivian should collaborate with producers while copy editing scripts to make sure their integrity stays intact. Vivian is nimble and an excellent journalist who can pivot very quickly from one assignment to another.  I look forward to her continued growth with the company.

91.    Clearly, Ms. Lee was, at the time, a valuable member of NY1's team.

**E.    Amanda Farinacci**

92.    Ms. Farinacci is 40 years old and has two children.  Ms. Farinacci started at NY1 in 2000 as an intern, worked her way around the newsroom doing various jobs and became employee staff reporter in 2004.

93.    Throughout her tenure, Ms. Farinacci has been a Staten Island reporter.

94.    Ms. Farinacci worked Tuesday through Saturday for eight years and eventually earned a Monday through Friday schedule.

95.    In June 2017, Ms. Farinacci reported and produced an impressive 30-minute investigative special called "Build it Broke," which focused on the city's storm recovery program.  This documentary also earned Ms. Farinacci second place from the New York State Associate Press for Best Documentary.

96.     In August 2017, Ms. Farinacci also reported and produced a groundbreaking news segment called "Smear Tactics" that drew attention from the New York Times and led the district attorney to appoint a special prosecutor who brought criminal charges against an attorney for creating fraudulent social media pages.

97.     In 2018, Ms. Farinacci was a 3-time Emmy Nominee, received the New York Press Club Continuing Coverage Award and was named in City and State Magazine, No. 39 of 100 Staten Island Most Influential People.  She also received the Excellence in Television Journalism award in 2010 from the Uniformed Officers Association and a host of other community distinctions.  Ms. Farinacci was recently selected as number 38 of the "100 most powerful people on Staten Island" by City and State Magazine for 2019.

98.     Like the rest of the Plaintiffs, Ms. Farinacci received exceptional praise from her manager, Joel Siegel (NY1's Managing Editor) in her performance reviews.

99.     In 2016, Mr. Siegel wrote:

> Amanda delivered impactful, exclusive reporting with citywide appeal . . . Amanda also did stories that no other outlet did that sought to explain Donald Trump's appeal on Staten Island . . . She brings a refreshing passion to her beat and a drive to do better.  She is, in fact, always open to suggestions to make her work better, and is steadily incorporating them into her work. She has shown growth as a storyteller - in the way she shoots, writes and tracks her stories.

100.     In 2017, Ms. Farinacci's performance review was even more complimentary:

> I've been impressed with Amanda's work and growth over the last year. Her 'Build it Broke' special was a big accomplishment. She basically functioned as a reporter, producer and a shooter on this project. Her reporting was first rate, as was her selection of characters to help tell the story. After it aired, Mayor de Blasio for the first time accepted some blame for the program's poor performance. Amanda's reporting on the fake Facebook pages intended to mimic those of Staten Island politicians triggered the district attorney to appoint a special prosecutor to investigate. She

also showed fearlessness in pursuing this story. Through it all Amanda worked tirelessly and without complaint. On a personal note, it has been a pleasure to work with her and to see her growth. I look forward to more big stories and professional growth by Amanda in 2018.

101.     Unfortunately, Ms. Farinacci has had few opportunities for "big stories" and "professional growth" as NY1 continues to prioritize younger talent for such prospects.

## III.     DISCRIMINATION AND RETALIATION AT NY1

102.     Despite Plaintiffs all advancing their careers throughout their tenures at NY1, the environment dramatically changed following the merger with Charter.

103.     Mr. Proia and Ms. Rabinovich instituted a new system of advancement that has favored younger women and men and displaced older women across the board.

104.     This discriminatory conduct has manifested itself in numerous demonstrable ways that are detailed below.

### A.     New Daily Schedule Favors Younger Women and Men

105.     A regular weekday anchor position is the most sought-after position in TV news journalism.  Of course, these positions and weekday air-time is limited.

106.     As set forth above, Ms. Torre has been a weekday mid-day anchor for more than 20 years – flanked by men both before and after her shift.  Ms. Torre has thrived in this role and is one of the most recognizable faces at the station.

107.     Nonetheless, despite Ms. Torre's extensive record, her role suddenly changed following the merger with Charter and the accession of Mr. Proia and Ms. Rabinovich to News Directors.  In mid-2017, NY1 rolled out a new and revamped weekly schedule which was used to marginalize Ms. Torre's role.

108.    Without any advance notice or discussion, Ms. Torre's anchor shift was abruptly chopped up and divided amongst other anchors.  In total, Ms. Torre lost four hours of daily on-air time – from 10a to 12p and 1p to 3p.  Ms. Torre now has only one hour of live solo air-time for a 12p show called *Your News Live at Noon* and two hours later in the day from 3p to 5p.

109.    The newly created time slots were given to a much younger woman, Ms. Driscoll, and her male counterpart Mr. Vertuccio.  In short, Ms. Torre lost substantial air-time to a much younger woman and a man, both of whom had far less experience and virtually no legitimate anchoring track record to justify this decision.

110.    No one at NY1 even had the decency to involve Ms. Torre in a dialogue on this decision.  Not only was there no advance discussion with Ms. Torre, there also was no advance discussion with the other Plaintiffs about this new opportunity.

111.    Notably, as set forth above, Ms. Shaughnessy, Ms. Ramirez and Ms. Lee had collectively anchored literally *thousands* of weekend shows and *hundreds* of mid-week shows in a fill-in capacity (as explained in more detail below).  Although Ms. Lee was in a part-time role, she had specifically told Mr. Bair (Executive Vice President of Spectrum Networks) that she was prepared to return in a full-time capacity as long as she would not continue to be marginalized.

112.    There is simply no stronger way of showing that Ms. Shaughnessy, Ms. Ramirez and Ms. Lee were qualified to take over this new show than the fact that NY1 trusted them for years behind the anchor desk during the weekend and as needed during the highest-rated slots mid-week.

113.    In contrast, prior to being assigned this prime daily anchoring shift, Ms. Driscoll and Mr. Vertuccio had never been the regular anchor of any show.  Mr. Vertuccio had only done a handful of fill-in anchoring and Ms. Driscoll had limited anchoring experience.

114.    As with Ms. Torre, NY1 did not engage in any dialogue with Ms. Ramirez, Ms. Shaughnessy or Ms. Lee about these positions – did not ask whether they were interested in the position or give them any opportunity to explain why they felt they might deserve the position. The entire concept was kept a complete secret from them.

115.    The reduction in Ms. Torre's daily anchoring and the favoring of younger female and male talent was not the only discriminatory aspect of the revamped schedule.

116.    A newly formatted morning show was created for Mr. Kiernan called *Mornings on 1*, complete with a multi-million dollar state-of-the-art studio known as Studio A.  In contrast, Studio B, where Ms. Torre broadcasts her live show, is completely inferior.

117.    While mornings are understandably the most watched mid-week show, the level of attention and support provided to Mr. Kiernan was over-the-top compared to Ms. Torre, who was left to languish in an older, far less equipped studio, with much less support.  When Ms. Torre asked Mr. Proia why she could not use the morning studio for her live noon show, she was told to "stop complaining."

118.    Furthermore, although it has not yet been implemented, it has been internally reported there will be further changes to the daily mid-week schedule.  Rumors have circulated at NY1 that even more time will be taken from Ms. Torre and shifted towards NY1's favored group.  Specifically, it has been said that NY1 will soon announce a live show from 4p to 5p which will be hosted – not by any of the more experienced Plaintiffs – but by Mr. Pascale.

119.    Put simply, the decision to take these anchor slots from Ms. Torre and not even consider offering the positions to the experienced, veteran Plaintiffs, and then give these slots to Ms. Driscoll and Mr. Vertuccio, defies any legitimate, non-discriminatory justification.

120.     The intent is clear:  NY1 wants younger women and men in front of the camera at the expense of its older female talent.  That conclusion is only reinforced by the numerous other ways NY1 has marginalized its older women and supported its younger women and men.

**B.     Fill-In Anchoring Practices Marginalizes Plaintiffs**

121.     As set forth above, when an anchor is unable to cover his or her normal shift, NY1 will assign a "fill-in" anchor to cover.

122.     Fill-in anchor opportunities are critically important for those who want to enhance their visibility and demonstrate their skills before a large audience and to management.

123.     Any reporter or weekend anchor hoping to secure a regular weekday anchor position needs to – or at least should need to – first demonstrate the ability to handle these fill-in time slots effectively when given the opportunity.

124.     For years, prior to the merger, Ms. Shaughnessy, Ms. Ramirez and Ms. Lee were NY1's primary weekday fill-in anchors.

125.     In particular, Ms. Shaughnessy was the go-to fill-in for morning weekday anchoring (the most prime slot), and Ms. Ramirez or Ms. Lee would handle that slot in Ms. Shaughnessy's absence.

126.     Ms. Shaughnessy, Ms. Ramirez and Ms. Lee were also the primary weekday fill-in coverage for other time slots throughout the year.

127.     These fill-in roles – which they had handled with success for years and during which time they received increased anchoring responsibilities – presumably put them in line for a more prime, regular anchoring role if and when one opened up.

128.     Of course, as set forth above, such a position did open up and none of the Plaintiffs were ever even considered.

129.    Not only was Ms. Shaughnessy, Ms. Ramirez and Ms. Lee's tremendous anchoring experience disregarded during the anchor selection process for the new mid-morning show, but following the merger, they have all been removed from the prime weekday fill-in anchoring rotation.

130.    The precipitous decline in these anchoring opportunities following Mr. Proia and Ms. Rabinovich becoming the News Directors is indisputable; and what is also indisputable is that the anchors who have taken over these fill-in opportunities are virtually all younger women and men.

131.    As set forth above, Ms. Shaughnessy was the primary weekday morning fill-in anchor when Mr. Kiernan needed coverage.

132.    However, after a high watermark of 48 morning fill-ins in 2017, Ms. Shaughnessy's morning fill-in anchoring opportunities have been slashed.

133.    In October 2017, after Mr. Kiernan launched *Mornings on 1*, Ms. Shaughnessy has not been permitted to fill-in for this new show.

134.    Notably, in 2018, NY1 hired a talent review coach to provide feedback for its anchors.  This coach, after reviewing some of Ms. Shaughnessy's videos, was bewildered that Ms. Shaughnessy had not been moved to a mid-week anchor position after all these years of weekend and fill-in anchoring.

135.    The chart below shows Ms. Shaughnessy's mid-week morning anchoring opportunities that grew over recent years, only to dramatically drop-off and then completely disappear following the merger.[10]

---

[10]    For the five fill-in dates in 2018, three were holidays:  July 4, Labor Day and Thanksgiving.  Typically, these are the least desirable fill-in dates.



136.    Of course, Ms. Shaughnessy is not alone.

137.    Ms. Ramirez was previously the go-to morning fill-in when Ms. Shaughnessy was unavailable, yet she too has not once been provided those anchoring opportunities since the merger.

138.    Mornings aside, post-merger all of Ms. Ramirez's weekday fill-in opportunities were initially reduced and then ultimately completely vanished.

139.    Ms. Ramirez's prospects first diminished directly after the merger – going from approximately 49 fill-ins in 2016 to 23 in 2017.

140.    However, in May 2017, with the precipitous decline in her chances to fill-in blatantly apparent, Ms. Ramirez emailed Mr. Proia to ask for a firm number of annual days to fill-in.  Mr. Proia refused to agree to any set number.  In the first half of 2018, Ms. Ramirez's fill-in days diminished even further – totaling only seven between January and June.

141.    In or around July 2018, Ms. Ramirez filed an internal discrimination complaint (explained in more detail below).  Incredibly, thereafter, Ms. Ramirez's fill-in opportunities

came to an absolute halt – Ms. Ramirez was not given a single weekday fill-in opportunity

throughout the remainder of 2018, nor has she been given any chances in 2019.

142.    There is simply no legitimate business justification for this pattern of conduct.

The chart below reflects the vanishing opportunities provided to Ms. Ramirez:



143.    Ms. Lee has suffered the same fate.

144.    Despite clearly being a highly talented anchor who was told that she would have

"continued growth with the company," her weekday fill-in anchor opportunities have also come

to an end.

145.    While Ms. Lee has not been a fill-in anchor as often as Ms. Shaughnessy or Ms.

Ramirez by virtue of being in a part-time role, her fill-in opportunities have also diminished, as

reflected in the below chart:[11]

---

[11]    The reason for the drop off from 2014 to 2016 was Ms. Lee's decision to return to NY1 part-time following maternity leave.



146.    In fact, in 2018, the talent review coach hired by NY1 reviewed Ms. Lee's anchoring skills and told her not to change anything about her delivery, that she makes good eye contact, looks away at the right times and that she is altogether engaging and natural on-air.

147.    The coach even asked "why are you only anchoring on the weekends?"  Ms. Lee responded: "because there is a stigma against senior people" and "experience does not matter here."

148.    NY1 is also providing talent coaching to the younger female anchors, including Ms. Driscoll, Ms. Ferry and Ms. Tuchman.

149.    Presumably, this is to improve their anchoring so they can all become even more firm fixtures in NY1's anchoring hierarchy.

150.    Notably, this coaching is not provided to any of the Plaintiffs.  This begs several questions:  Is it not provided to them because they are not in need of such coaching?  Or, is it not provided to them because NY1 is focusing on its younger female talent?  Whichever is the case, it only further establishes the existence of a discriminatory culture.

151.    While Ms. Farinacci was not previously part of the weekday fill-in rotation, she too has been marginalized under the Charter regime.

152.    Ms. Farinacci, as a 19-year employee, has certainly earned the opportunity to be behind the anchor desk, yet these opportunities are simply not being provided to her.

153.    In or around April 2018, Ms. Farinacci approached Mr. Ronayne (Senior Vice President of NY1) to discuss her career path, including her desire to be provided with more anchoring opportunities.

154.    Mr. Ronayne told Ms. Farinacci she needed to discuss this with Mr. Proia and Ms. Rabinovich.

155.    As such, shortly thereafter, Ms. Farinacci asked Mr. Proia and Ms. Rabinovich to meet as Mr. Ronayne had recommended.

156.    At this meeting, Mr. Proia and Ms. Rabinovich responded – as seems to be their custom – by reprimanding Ms. Farinacci for speaking with Mr. Ronayne.

157.    Mr. Proia dictated that "Mr. Ronayne is *my* boss, and I am *your* boss, and any issues should come to me before they go to him."

158.    Shortly thereafter, Ms. Rabinovich told Ms. Farinacci to send a list of available dates for fill-in roles the remainder of the year (which she provided, and it included 10 weekend dates in the summer).

159.    Ultimately, Ms. Rabinovich only offered Ms. Farinacci *one* anchoring job over the course of the entire summer, and it was on one day's notice when Ms. Farinacci was away on vacation with her family (Ms. Farinacci cut her vacation short and left her family to cover the anchor spot).

160.    A subsequent opportunity came in November 2018, only after Ms. Farinacci again complained to Mr. Proia about not being given any anchor days during the entire holiday season.

161.    In total, Ms. Shaughnessy, Ms. Ramirez and Ms. Lee have lost not only the opportunity to become a full-time anchor for a daily mid-morning show but also the opportunity to cover prime mid-week fill-in anchor slots.

162.    These opportunities are now being provided to several younger female and male reporters.  As stated, the new mid-morning show (which created 260 additional anchor slots per year) all went to Ms. Driscoll and Mr. Vertuccio.

163.    However, when one of them is unable to cover the shift, they nearly always either fill-in for each other, or the fill-in opportunities are provided to the much younger Ms. Ferry.

164.    The fact that Plaintiffs have been brushed aside with respect to the newly created mid-morning show and completely disregarded for prime mid-week fill-in opportunities in favor of younger women and men is alone substantial evidence of discrimination.

165.    However, as described further below, numerous other opportunities have been created for the benefit of this preferred group that has further marginalized Plaintiffs.

C.    *Around The Boroughs* **and Other Anchoring Positions**

166.    In 2017, Ms. Rabinovich created a new anchor position for a segment called *Around the Boroughs* ("*ATB*"), which is a short but highly visible piece that runs approximately once per hour throughout the day.  There are two *ATB* anchors per day, which means approximately 730 anchor positions per year.

167.    *ATB* was blatantly created to provide on-air anchoring opportunities for new and younger anchors.  The journalists who have handled *ATB* are primarily Ms. Driscoll (when not a mid-morning anchor), Mr. Vertuccio (when not a mid-morning anchor), Ms. Gonzalez, Ms. Tieu,

Ms. Ferry, Ms. Tuchman, Mr. Pascale and Ms. McGowan – all younger women and two men. The creation of *ATB* demonstrates NY1's desire to thrust younger talent on-air at the expense of older talent.

168.    Plaintiffs – Ms. Shaughnessy, Ms. Ramirez, Ms. Lee and Ms. Farinacci in particular – have not been included in these highly visible *ATB* segments.  While providing opportunities for younger talent is not inherently improper, it is highly problematic when it is being done during a time period when all the new advancement opportunities are diminishing for older female talent.

169.    In addition, NY1 has created several additional anchor positions for which Plaintiffs have all been bypassed.  For instance, but only by way of example, NY1 created a daily anchoring segment called *Money on 1* which airs throughout the day.  This program has been assigned to a man – Mr. McClure – rather than any of the Plaintiffs.

170.    Moreover, to the extent Mr. McClure needs a fill-in, nearly all such opportunities have been provided to Ms. Ferry and Ms. Gonzalez, never to any of the Plaintiffs.  Notably, neither Ms. Ferry nor Ms. Gonzalez has any financial background to justify such favoritism for this segment.[12]

171.    Taken together, between the newly created mid-morning show, *ATB* and *Money on 1*, the revamped weekly schedule has created well over 1,200 new anchor slots per year.

172.    Incredibly, over a period of approximately a year-and-a-half since these changes were made, *none* of these anchoring positions have been provided to Ms. Shaughnessy, Ms.

---

[12]    Ms. Lee especially should have been a prime candidate for this anchor role; she had filled in many times as the "Money Anchor" for Annika Pergament, the current Senior Business Anchor, (and was trained by Ms. Pergament herself to handle this shift) when the segment was called *From the Floor*.  Ms. Lee has not been asked to fill-in once since Ms. Rabinovich and Mr. Proia created *Money on 1*.

Ramirez, Ms. Lee or Ms. Farinacci and *all of them* have been provided to either younger women or men.

### D.    Promotional Opportunities Favor Younger Women and Men

173.    NY1 engages in substantial promotional efforts for its on-air talent.  However, since the merger, these marketing efforts have focused on the younger women and men.  This pattern is fully consistent with the conduct described above.

174.    For instance, starting in 2017, NY1 started producing promotional videos ("promos") for its anchors and reporters.  These promos air periodically throughout the day to highlight the careers of each member of the NY1 team.  However, Plaintiffs all noticed that while promo videos were produced for all the younger female talent as well as the men, they were left without this promotional support and publicity.

175.    For her part, Ms. Torre made several impassioned pleas – both to Mr. Ronayne and Mr. Proia – for her own personal promo (and also for a *Live at Noon* promo).  Eventually, management agreed to produce a promo video which would advertise her show, though even this was littered with problems.

176.    First, the vendor hired to do the promo video was second-rate and could not even finish the job and it was later handed off to another vendor to finish.

177.    Second, Ms. Torre's promo video pales in comparison to the far more expensive and professional promo videos done for others.

178.    Third, even now, Ms. Torre's promo video airs infrequently while the others are on heavy rotation with repeated airings throughout the day.

179.     Fourth, unlike the younger talent, Ms. Torre's promo video is not even a personal promo; rather, it advertises her show using old footage and the closing shot features Ms. Torre in the wrong studio.

180.     Clearly, promoting Ms. Torre was an afterthought at NY1.

181.     Ms. Shaughnessy, Ms. Ramirez and Ms. Lee never received any promo video highlighting their contributions to NY1.[13]

182.     On or about May 21, 2018, Ms. Ramirez had a lunch meeting with Mr. Proia and Ms. Rabinovich and asked for a personal promo video, but they responded that those decisions were made by the "marketing team" and there was nothing they could do for her.

183.     Altogether, the message has been very clear:  NY1 is not interested in highlighting older women as fixtures of its on-air team.

184.     Moreover, 2017 marked NY1's 25th anniversary, but Ms. Torre was also completely disregarded for any anniversary celebration.

185.     In late 2017, NY1 management rolled out a massive celebration of Mr. Kiernan's 20 years as morning anchor.

186.     NY1's promotion of Mr. Kiernan's anniversary included dedicated on-air segments, website tributes and montages, an in-house party, advertisements on city buses and

---

[13]     NY1 eventually did a promo for *Spotlight*, but not for Ms. Lee.  *Spotlight* has been cancelled (described below) and therefore this promo is no longer played.  While Ms. Farinacci ultimately received a promo, it was only after a Staten Island promo aired which did not feature her, she complained about it and then several months passed before anything was done.  Ms. Farinacci's promo only started airing in mid-2018, whereas the others started airing a year earlier in mid-2017.

three food trucks that traveled throughout the city with Mr. Kiernan on board and TV cameras in tow.[14]

187.    Put simply, the promotional effort for Mr. Kiernan was considerable.

188.    Ms. Torre, by contrast, with a longer tenure and celebrating 25 years on-air with her own daily live show, received no special promotion whatsoever – and again, is relegated to an inferior studio, without comparable support and with less air time than ever before.

189.    NY1 decided to focus its promotional efforts on Mr. Kiernan rather than even give a "slice" to Ms. Torre.

190.    NY1 also recently created a podcast for Mr. Kiernan that has received additional promotional coverage never offered to Ms. Torre.

191.    These decisions are all consistent with the array of other decisions which have highlighted younger women and men, all at the expense of older women.

192.    NY1's favoritism towards Mr. Kiernan at Ms. Torre's expense was recently highlighted in blatant fashion at the 2019 New York Emmy Awards ceremony.

193.    As set forth above, Ms. Torre was awarded an Emmy in the category of Arts Program for her theater reviews.  NY1 celebrated this event through a tweet about Mr. Kiernan rather than simply highlighting Ms. Torre and Ms. Torre alone:

---

[14]    See e.g. https://www.ny1.com/nyc/all-boroughs/news/special-reports/pat-kiernan-20th-anniversary; https://www.ny1.com/nyc/all-boroughs/news/2017/09/29/pat-kiernan-20-years-at-ny1?cid=share_email; and https://www.ny1.com/nyc/all-boroughs/news/2017/10/13/20-years-of-mornings-with-pat?cid=share_email.



194.   The idea that using Ms. Torre's accomplishment to mention Mr. Kiernan was inappropriate was not lost on the public.  One Twitter member picked up on this immediately:



E. **Reduction in Plaintiffs' Duties and Responsibilities**

195.    In addition to all the other lost opportunities that have been diverted towards the preferred group, Plaintiffs have been forced into junior reporting positions more fitting for entry-level journalists rather than award-winning older women.

196.    For instance, as described below in more detail, in January 2019, after Ms. Shaughnessy had raised complaints of discrimination, she was relegated to a General Assignment ("GA") reporter role.

197.    This is a role most reporters are asked to fill early on in their careers – it usually entails shooting one's own piece (no cameraperson is provided to assist) and running around the city at the request of the Assignment Desk rather than shooting significant pieces.

198.    As set forth above, Ms. Shaughnessy had previously been working on feature stories and acting as a Breaking News reporter, a coveted reporter position supported with a dedicated cameraperson.

199.    Ms. Rabinovich did not even have the decency to have a discussion with Ms. Shaughnessy about this change; rather, Ms. Rabinovich emailed Ms. Shaughnessy that she was needed as the 9a GA for a week in early January 2019.  There had been absolutely no conversation about this change prior to that email.

200.    However, as a team player Ms. Shaughnessy agreed to handle the position for that week.  Ms. Shaughnessy, who had been working on feature stories, was forced to immediately cancel all of her shoots and interviews she had scheduled for that week.

201.    Two weeks later, Ms. Shaughnessy was again on the schedule as the 9a GA reporter.  Ms. Shaughnessy emailed Ms. Rabinovich saying that she would have appreciated the

courtesy of being told that her role was being changed, particularly given that she had never done a 9a GA reporter shift in her lengthy career at NY1.

202.     Ms. Rabinovich's response missed the point, stating: "We have the utmost confidence in your ability to handle the shift."

203.     Ms. Lee has also been sidelined.

204.     As set forth above, in late 2017, Ms. Lee became the host for a new show called *Spotlight*.  Ms. Lee would tape *Spotlight* on Fridays, which meant she had to give up her duties as a Breaking News reporter.

205.     However, in early 2019, *Spotlight* was cancelled, with its last episode airing on January 4, 2019.  Rather than move back into her previous Friday 5a Breaking News role, Ms. Lee was also told that she would be a 9a GA reporter instead.

206.     Of course, it is a significant demotion for Ms. Lee to go from being Breaking News reporter, then to a host of a show, only to one year later find herself filling the 9a GA reporter role.

207.     As with everything else, the Breaking News roles that were previously held by Ms. Shaughnessy and Ms. Lee are now being covered by younger women and men – primarily Ms. Tuchman, Mr. Vertuccio and Ms. Hu.

208.     Rather than relegate these younger, less experienced journalists to the 9a GA role, that demotion has been directed towards Plaintiffs.

### F.     Additional Mistreatment Towards Older Women

209.     In addition to the tangible loss of air-time, opportunities and promotion, Plaintiffs have also lost support and basic professional courtesies relative to the preferred group of talent.

210.    Ms. Torre's show, *Your News Live at Noon* is provided a dearth of support compared to all the other NY1 productions.

211.    Ms. Torre does not even have a full-time producer; rather, she is assigned a hodgepodge of producers each day and as a result, the show lacks consistency and requires Ms. Torre to do much of the writing herself.  All the other shows have a dedicated full-time staff.

212.    As proof of NY1's lack of commitment to her show, one can see that on the NY1 website, under the heading "Latest News," there are entries for all the other shows except Ms. Torre's.[15]

213.    Furthermore, approximately 18 months ago, NY1 hired makeup artists to assist the talent on the morning show; Ms. Torre was told the makeup was not for her but if she came to work earlier, she could have makeup and hair as well.  Ms. Torre balked and the makeup artists pleaded with management to extend the service half an hour to include Ms. Torre.

214.    Only a few months later, Ms. Torre was told in an email from management that the makeup crew did not want to stay the extra time (i.e. later).  When Ms. Torre inquired with the makeup crew, they said they were willing to stay the extra time but were told by management they had to leave earlier.  When Ms. Torre confronted management about this, they told her the makeup crew was lying to her.  In the end, Ms. Torre was ordered to come to work by 9a for makeup even though she is not on-air until noon.[16]

215.    Previously, Ms. Torre's taped theater reviews routinely aired on NY1's theater show *NY1 On Stage* ("*On Stage*") – which is hosted by Frank DiLella (age: ~32) – every

---

[15]     See https://www.ny1.com/nyc/all-boroughs at the "Latest News" tab.
[16]     Several weeks later, management announced a new makeup and hair shift from 3p to 9p to accommodate the evening shows.  Ms. Torre's midday shift still has no makeup or hair services available.

weekend (twice on Saturdays nights and twice on Sunday nights). Soon after Charter took over, Ms. Torre's theater reviews stopped appearing on *NY1 On Stage*.

216. Ms. Torre has complained about this to Mr. Ronayne, Mr. Proia and Ms. Rabinovich. They told Ms. Torre that they were informed by Kevin Dugan (*On Stage* Executive Producer) that the show airs the major reviews, but that was simply not true.

217. Additionally, in January 2019, Mr. Dugan told Ms. Torre that her reviews could not be edited because there was a shortage of staff to handle her reviews. Ms. Torre asked Lloyd Foster (*On Stage* Head Editor) if that was true, and he responded that it was "absolutely not" and added that he and his staff were always available to edit her reviews.

218. Ms. Torre's understandable concern about this was even acknowledged by Mr. Proia in her 2017 annual review. Mr. Proia stated that "there was much unnecessary angst involving other programming outside of news, including Onstage. There was frustration that became a struggle to handle week-to week. However, as of this writing, it appears that has settled and I hope that we have a clearer picture on that going forward."

219. Of course, nothing was ever "settled." *On Stage* continues to exclude Ms. Torre's reviews. Incredibly, Ms. Torre's *one* review that was actually aired on *On Stage* in 2018 (review of the Harry Potter Broadway play) earned her an Emmy nomination.

220. In or around March 2018, Ms. Farinacci had a lengthy conversation with Ms. Rabinovich, Mr. Proia and Robert Hardt (NY1's Political Director) about being involved in coverage of the primary Congressional race between Michael Grimm and Dan Donovan.

221. Ms. Farinacci expected to be heavily involved given that she lives on Staten Island, has been a Staten Island reporter for 15 years, had earned Mr. Grimm's first post-prison interview, first broke the news that he would be running for Congress post-incarceration and then

reported his formal announcement as well.  Accordingly, Ms. Farinacci was assured

that she would play a large role in the race coverage.

222.    When NY1 planned the only debate in the race on June 14, 2018, Ms. Farinacci

was under the impression she would be a panelist (with Errol Louis of course) as typically a

political reporter and a beat reporter would be included.

223.    However, without a clear explanation, Ms. Rabinovich told Ms. Farinacci the

week before the debate (and only after Ms. Farinacci asked) that she would not play any role in

the debate.   The panelist who was chosen instead of her was Mr. Pascale.

224.    Similarly, as mentioned, Ms. Farinacci produced a documentary piece called

*Build It Broke* which aired in 2017.  Directly after the documentary aired, NY1 planned a live

town hall event.

225.    Despite the fact that the event was based on her reporting, Mr. Pascale was asked

to be the town hall moderator while Ms. Farinacci sat in the audience like a member of the

public.  This was highly insulting and embarrassing to Ms. Farinacci.

226.    In February 2019, Ms. Lee was offered a paid hosting opportunity presented to

her by the Leading Authorities Speakers Bureau for *The Atlantic's* Renewal Summit.

227.    Ms. Lee presented this opportunity – which would promote Ms. Lee and provide

her with additional compensation, as well as help promote NY1 – to Mr. Proia and Mr. Ronayne,

but neither provided timely approval.

228.    As a result, Ms. Lee informed the event organizer that she could not yet commit

to the event and they should feel free to look elsewhere.  Ultimately, Ms. Lee lost this prestigious

opportunity.

229.   Around the same time, NY1's Jamie Stelter – who is part of the preferred group and typically co-hosts *Mornings on* 1 with Mr. Kiernan – appeared on *Good Morning America* to promote a rather insignificant story regarding a cheap Amazon winter coat that had gone viral.

230.   In September 2018, Ms. Farinacci was nominated to receive a "Power Woman" award at the Schneps Communications 2018 Staten Island Power Women in Business Awards & Networking Event.

231.   This event honored top businesswomen and community leaders for their outstanding leadership and contributions to the Staten Island community.

232.   The award was to be presented to Ms. Farinacci on the evening of September 13, 2018 and the reception included a business expo with networking followed by dinner and an awards ceremony.

233.   Ms. Farinacci was honored and excited to attend the reception but when she asked Ms. Rabinovich if she could attend, Ms. Rabinovich said no.

234.   A few months later, Ms. Ferry was invited to the same Schneps Communications event in Queens and naturally, Ms. Rabinovich encouraged Ms. Ferry to attend and receive the distinction.

235.   NY1 has a practice of providing all talent with a two-day "weekend," which may not be Saturday and Sunday for those who cover shifts on those days.

236.   In 2018, Ms. Shaughnessy's "weekend" was changed from Tuesday/Wednesday to Thursday/Friday without any conversation.

237.   Not only was this a highly inconsiderate decision to unilaterally impose on a 23-year employee, it also limited Ms. Shaughnessy's ability to fill-in anchor even further as she had

been a usual fill-in for Ms. Torre on Thursdays (Ms. Torre, at times, particularly during awards season, would take days off from anchoring to handle theater reviews).

238.   Thus, in effect, to the extent Ms. Shaughnessy wants to fill-in for Ms. Torre, she often now has to "split" her "weekends."  No other talent is forced to regularly split their "weekend" to get anchoring opportunities.

239.   In December 2017, Ms. Ramirez broke her finger while reporting.

240.   Ms. Rabinovich was not helpful about accommodating her (she was not to carry any equipment over five pounds for a month) and even suggested to Ms. Ramirez that she needed "to be out of the office for a month."

241.   Mr. Proia also suggested that Ms. Ramirez take leave rather than seek accommodations.  Ms. Rabinovich and Mr. Proia were far too quick to suggest that Ms. Ramirez leave the workplace rather than simply offer to help accommodate her needs.

242.   Also by way of example, in July, 2018 Ms. Ramirez asked for approval from Ms. Rabinovich to be in a Spike Lee movie.

243.   Ms. Rabinovich refused to provide an answer, leaving Ms. Ramirez hanging "in the wind" for an exciting career opportunity.

244.   Eventually, Ms. Ramirez went to Mr. Bair and sought his approval.

245.   If it had been a younger female anchor who had come to Ms. Rabinovich with a movie prospect, she certainly would have given her approval right away, ensuring that one of her favorites was spotlighted as much as possible.

**G.     Unequal Compensation**

246.   The gender discrimination and mistreatment extends to compensation.

247. Upon information and belief, Ms. Torre has been dramatically underpaid relative to her male daily on-air counterparts.

248. Upon information and belief, Ms. Torre's salary is less than half that of Mr. Kiernan and is substantially less than other male anchors with similar skill and with similar, or even less, experience.

249. Upon information and belief, NY1's decision to pay significantly more compensation to male anchors than to Ms. Torre is not based on a bona fide factor other than or unrelated to gender.

250. To the extent NY1 claims that Ms. Torre is paid less than certain male counterparts is because she does not service a more highly trafficked time slot, such a claim only proves that male anchors have been and continue to be favored with the most prime opportunities that carry the greatest compensation.

251. Moreover, NY1 has taken significant on-air time from Ms. Torre and re-distributed it to its younger female and male talent.

252. Furthermore, Ms. Torre goes above-and-beyond in her daily show, has done theater reviews for 26 years and does not get paid any additional amount for these contributions.

## IV.    COMPLAINTS AND LACK OF REMEDIAL MEASURES

### A.    Charter's Policies Against Discrimination are a Façade

253. Charter claims that it has standard-issue policies that prohibit discrimination and retaliation in the workplace and provide for prompt and thorough investigations upon an employee complaint.

254.    Charter's "Open Door Policy" states that employees are "encouraged to submit concerns" to either leadership or HR and that any such concerns submitted to a supervisor are *required* to be escalated to HR.

255.    Charter prohibits employees from impeding the Open Door Policy in any way. Charter's "Anti-Harassment Policy" guarantees that any complaint of discrimination will be promptly investigated.[17]

256.    However, Plaintiffs all filed numerous internal complaints of discrimination, yet the conduct about which they complained has only worsened.

257.    Over the last several years, Plaintiffs and other NY1 employees have raised internal complaints both verbally and in writing to numerous supervisory and HR personnel, including but not limited to Mr. Proia, Ms. Rabinovich, Mr. Bair, Mr. Ronayne, John McNally (HR representative), Tara Reilly (Senior Director of HR from Albany) and Tracey Rhoney (Charter Employee Relations Manager from North Carolina).

258.    Despite Charter's policies, these complaints have rarely been escalated to HR and have not been investigated.  Moreover, Charter's leadership has actively discouraged Plaintiffs from continuing to voice their concerns.

259.    In 2018, NY1 held a series of the "Engaging in a Respectful Workplace" training seminars.[18]  However, NY1's training appears to have given employees the false impression that

---

[17]    The Open Door Policy differs from the Anti-Harassment Policy; the former does not state that all complaints will be investigated and instead provides for investigations only "when appropriate" without further explanation.

[18]    These seminars came on the heels of a complaint by another female anchor filed with Mr. McNally, Mr. Bair and Mr. Ronayne, demanding to address condescending and inappropriate treatment by Ms. Rabinovich.  Upon information and belief, Ms. Rabinovich was reprimanded for her conduct.

workplace conduct that is "rude," "unprofessional," "unjust," "unwelcoming" and even "bullying" and "abusive" cannot be unlawful.

260.    In fact, a graphic used in this presentation sends a message that virtually nothing in the workplace is actually "illegal."  Even worse, in describing the "outcomes" of improper and abusive conduct, the training appears to have only focused on workplace productivity and does not appear to have even acknowledged the most important potential outcome – that mistreatment in the workplace can be devastating to the victim.




261.    It quickly became clear to Ms. Torre, Ms. Shaughnessy, Ms. Ramirez, Ms. Lee and Ms. Farinacci and others that this "Respectful Workplace" training was woefully inadequate.

**B.    Complaints by Ms. Ramirez**

262.    Directly after these "Respectful Workplace" seminars, on or about July 16, 2018, Mr. Siegel (Ms. Ramirez's supervisor) screamed and cursed at Ms. Ramirez in an extremely demeaning and humiliating manner in the middle of the newsroom.

263.    Later that day, Ms. Ramirez complained by email to Mr. McNally, Mr. Bair and Mr. Ronayne that Mr. Siegel's conduct was unacceptable.

264.     Ms. Ramirez met with Mr. McNally in the days that followed and she expounded on her email to raise complaints about the broad discriminatory treatment pervading the workplace.

265.     On July 23, 2018, after having not received any response, Ms. Ramirez followed up with Mr. McNally explaining that she remained uncomfortable around Mr. Siegel since the incident.

266.     Mr. McNally then responded that Mr. Siegel had only been spoken to for the first time that day – a full week after Ms. Ramirez's complaint – clearly showing a lack of focus on these issues.

267.     Eventually, Mr. Siegel apologized for his behavior, admitting that he should be a "better human being" but at the same time attempting to justify his conduct on the basis that he "used to be a newspaper guy where they act like that all the time."

268.     Ms. Ramirez explained to Mr. Siegel that he is no longer working at a "newspaper" and that "this is 2018 and that type of behavior is not acceptable anywhere."

269.     This apology was short-lived and of minimal value, as the mistreatment in the newsroom continued unabated thereafter.

270.     Several months later, in the fall of 2018, Ms. Rhoney commenced a broad investigation into the culture at NY1.

271.     Upon information and belief, this investigation was the product of another female journalist's complaints, Ms. Ramirez's complaint, and a variety of other complaints filed – whether formally or more informally – during and after the "Respectful Workplace" training seminars.

272.     Ms. Rhoney and her team met and spoke with numerous employees, including Ms. Torre, Ms. Shaughnessy, Ms. Ramirez, Ms. Lee and Ms. Farinacci, to assess the myriad problems in the workplace.

273.     Plaintiffs – including Ms. Ramirez – stated during these interviews that they had been discriminated against for the reasons and on the bases described above and that the younger women and men were being favored.

274.     Moreover, upon information and belief, several *other* employees also raised similar concerns.

275.     To address the level of discontent, in or around January 2019, NY1 started a series of "culture meetings."  Upon information and belief, during these "culture meetings" several older veterans at NY1 raised similar age and gender concerns to those raised by Plaintiffs.

276.     Following Ms. Ramirez's July 2018 complaint, Mr. Proia and Ms. Rabinovich have only made Ms. Ramirez's life worse – clearly acts of retaliation.

277.     As described above, Mr. Proia and Ms. Rabinovich refused to provide Ms. Ramirez with any fill-in opportunities going forward.

278.     Furthermore, all Plaintiffs have been subjected to increased mistreatment through the present, which is clear retaliation against them for supporting for Ms. Ramirez's initial complaint and for voicing their own complaints in the process.

279.     On March 25, 2019, in a more recent act of retaliation, Mr. Siegel and Shannon Troetel (the Head of the Assignment Desk) provided Ms. Ramirez with her annual review.

280.     Like her prior assessments, this one highlighted her strengths; i.e. "she is one of the most accomplished reporters on laptop editing; her edited packages are almost always ready

to air, without much tweaking by a professional video editor.  Jeanine also is a solid writer; her scripts are usually clean and flow logically."

281.    However, the review went on to criticize Ms. Ramirez's work; i.e. "her stories also were overwhelmingly 'one-stop shopping' shoots that could be completed at one location. Nothing wrong in pitching such stories, but they should not be virtually the only kind of stories a reporter does.  Finally Jeanine needs to be pro-active in localizing stories of citywide or national importance."

282.    The evaluation failed to mention Ms. Ramirez's two recent Emmy nominations, her 2018 New York Press Club Award, or the recognition from Brooklyn Borough President Eric Adams that she received earlier in 2019.

### C.    Complaints by Ms. Shaughnessy

283.    In the summer of 2017, a few months after Mr. Proia became the News Director, Ms. Rabinovich excitedly told Ms. Shaughnessy that Mr. Proia had said to her, "this is our newsroom now and we can run it the way we want."   As Plaintiffs have all seen, this meant marginalizing them and creating a younger female and male on-air presence.

284.    In the fall of 2017, Ms. Shaughnessy raised complaints to Mr. Proia about not being offered the opportunity to fill-in for Mr. Kiernan on his new live morning show *Mornings on 1*.  Mr. Proia responded that there was no clearly defined rule but that this was a new show so they were "going in a different direction."   To this day, Ms. Shaughnessy has yet to fill-in for *Mornings on 1.*

285.    A few months later, in or around March 2018, Ms. Shaughnessy informed Mr. Bair that she felt marginalized by Ms. Rabinovich and felt the need to defend herself.

286.    Mr. Bair urged her not to do anything formal, explaining that Ms. Rabinovich would likely hold it against her."  Mr. Bair also said, "I like what she's done with her group" – a not-so-subtle endorsement of Ms. Rabinovich's favoritism towards the younger female talent.

287.    Ms. Shaughnessy stated the obvious – that she felt that she was being passed over for better anchoring positions.  Nothing was ever done to address Ms. Shaughnessy's concerns.

288.    Not content to let things to continue to deteriorate, on July 22, 2018 (just before Ms. Ramirez's complaint to HR), Ms. Shaughnessy emailed Ms. Rabinovich and stated that she was ready to do whatever was needed to get back into the fold of anchoring weekday mornings.

289.    Notably, Ms. Shaughnessy did not limit herself to mornings or "live" shows, and said she was available for any anchoring opportunities that became available.  However, Ms. Shaughnessy's prime time anchoring responsibilities continued to decrease.

290.    On or about October 30, 2018, Ms. Shaughnessy had a conversation with Mr. Proia in which she complained that her fill-in numbers for weekday morning anchoring had continued to decrease.  Mr. Proia said Ms. Shaughnessy was doing great and did not need to do anything different.

291.    On November 26, 2018, Ms. Shaughnessy and Mr. Proia met again, and Ms. Shaughnessy said nothing was improving and it was unfair because she is one of the stronger anchors.  Mr. Proia told Ms. Shaughnessy to be patient.  Ms. Shaughnessy retorted that she had already been very patient.  As stated, Ms. Shaughnessy had been adamant that she was ready to do "whatever it took" to get back on the weekday morning fill-in list.

292.    In August 2018, Ms. Shaughnessy was interviewed by Ms. Rhoney in connection with the ongoing culture investigation.  Ms. Shaughnessy informed Ms. Rhoney that she had complained about Ms. Rabinovich to Mr. Bair earlier that year but that nothing had

changed.  Ms. Shaughnessy further told Ms. Rhoney that Ms. Rabinovich's re-shaping of the on-air talent appeared to be supported at NY1 and there was no one left to advocate for the older women reporters and anchors.  This complaint, like every other, went nowhere.

293.    On December 8, 2018, Ms. Shaughnessy emailed Mr. Proia again asking to cover morning weekday anchoring shifts and providing a detailed proposal for how this could be arranged.  Still, nothing changed.

294.    Furthermore, as described above, in a recent act of retaliation and further marginalization on top of everything else, Ms. Rabinovich and Mr. Proia recently demoted Ms. Shaughnessy to a 9a GA role – the most junior reporting position.

### D.    <u>Complaints by Ms. Torre</u>

295.    Ms. Torre has made various complaints regarding the mistreatment described above.  Ms. Torre has complained to Ms. Rabinovich and Mr. Proia several times regarding the newer, younger staff getting favorable treatment, about not getting an appropriate promo video and not getting the same level of attention as the younger talent.  However, nothing was ever remedied in any way.

296.    In or around October 2017, Ms. Torre spoke to Mr. Proia and repeatedly told him she felt she was being "singled out" and that NY1 was devoting resources to others rather than to her.  Ms. Torre complained that she was being "pushed aside" in favor of Mr. Kiernan and the younger set.  Ms. Torre made clear that this complaint was not isolated to her, stating in sum and substance that "All those of us who are not part of the focused group in this place are really feeling it.  We're feeling like we're second-class citizens."

297.    Mr. Proia, implying that Ms. Torre was acting irrationally, responded "There isn't an overall conspiracy.  Trust me."  Upon information and belief, Mr. Proia never escalated this to HR in contravention of Charter policy.

298.    In early February 2018, Ms. Torre and Mr. Proia spoke about these matters again. During that discussion, Ms. Torre again informed Mr. Proia that she felt she was being "jerked around" and "targeted."

299.    Mr. Proia responded, "Those are fighting words, Roma."  Of course, Ms. Torre was not looking for a "fight" but just to be treated fairly.  It was completely inappropriate for Mr. Proia to attempt to make Ms. Torre feel that she was being too "aggressive" for complaining about discrimination.  Mr. Proia, without even looking into Ms. Torre's claims, concluded the discussion stating, "Nothing's calculated, nobody's targeting you."

300.    Upon information and belief, Mr. Proia never escalated this to HR in contravention of Charter policy.

301.    Approximately one week later, Ms. Torre spoke to Mr. Ronayne, and she again complained in sum and substance:  "This is why I feel targeted.  I don't know if you've noticed, but the older reporters don't get on the air as much and the younger reporters seem to be on the air all the time."  Ms. Torre continued to explain that she was concerned about retribution for having the courage to raise these complaints and being branded a "complainer."  In fact, she informed Mr. Ronayne that when she spoke to Mr. Proia, he said "I don't want to hear any more. That's just the way it is.  Too bad. Boo hoo."

302.    Ms. Torre also complained about an exchange she had with Ms. Rabinovich in which Ms. Rabinovich said, "I don't know what's wrong with *you people* that you feel you're being marginalized."  Ms. Torre had told her that "Well, we're the veterans and we're less on the

air than ever before."  Nonetheless, Mr. Ronayne said he did not think HR should be involved.

Upon information and belief, Mr. Ronayne never escalated this to HR in contravention of

Charter policy.

303.    Thereafter, Ms. Torre has had several discussions with Mr. Proia and Mr.

Ronayne where she has continued to express her concern that she and her fellow older female

colleagues continue to be marginalized.

304.    On one occasion, Ms. Torre summarized to Mr. Proia that, "We're all getting the

feeling that Melissa is promoting the younger ones at the expense of the older ones."  To which

Mr. Proia responded that he was "agitated" by her complaints and that her concerns were

"nonsense."  Despite this response, Mr. Proia never investigated Ms. Torre's claims or escalated

the complaint pursuant to NY1 policy.

305.    On another occasion, Mr. Proia stated that "there's too much complaining" and

blamed Ms. Torre's declining role on the marketing department.  Mr. Proia's response did not

"encourage" Ms. Torre to raise complaints and clearly attempted to dissuade her from doing so –

in violation of Charter's Open Door Policy.

306.    As with everyone else, Ms. Torre was interviewed by Ms. Rhoney during the

broad culture review conducted starting in August 2018.  During Ms. Torre's discussion with

Ms. Rhoney, she again verbalized her complaints about discrimination and favoritism in the NY1

newsroom.  Despite Ms. Torre's numerous complains, the status quo remains.

307.    As described above, rumors have circulated in the newsroom that Ms. Torre will

lose even more anchor time to a younger man.

E.     **Complaints by Ms. Lee**

308.     In or around fall 2017, Ms. Lee was informed by a colleague that Ms. Rabinovich had said she was not going to provide Ms. Lee with fill-in anchoring positions because she took too long to respond to fill-in requests "due to her childcare obligations." This is blatant age and gender discrimination as many of the younger women do not have children.

309.     Ms. Lee was aghast that this was the basis for business decisions that affected her career. Ms. Lee raised this in her year-end review, stating that her extensive tenure at NY1 should have some meaning.

310.     In October 2017, Ms. Lee complained to Mr. Proia about Ms. Driscoll receiving the newly created anchor position and her not being considered for the role. Ms. Lee complained that Ms. Rabinovich was favoring her younger hires in the shift assignments.

311.     Apparently, word of Ms. Lee's complaints got back to Ms. Rabinovich, and she approached Ms. Lee. Ms. Lee confirmed her concerns of age bias directly to Ms. Rabinovich. However, nothing was ever done in response to her complaints. To the contrary, Ms. Rabinovich has removed Ms. Lee from the fill-in anchor rotation and relegated her to a 9a GA reporter role – just like she did with Ms. Shaughnessy.

312.     On March 1, 2018, Ms. Lee met with Mr. Bair to further express her concerns about Ms. Rabinovich given that her anchoring opportunities had fully disappeared. Ms. Lee told Mr. Bair that "favoritism is pushing out the older set."

313.     Ms. Lee also told Mr. Bair that Ms. Rabinovich "gave shots to people that should have gone to veterans of NY1," and that she felt disrespected and "sidelined." Ms. Lee stated that she was prepared to come back to NY1 in a full-time capacity, but she was afraid that she "no longer counted" under the new regime.

314.    Mr. Bair, missing the point, responded that "new talent had to be encouraged and cultivated."  Again, nothing was ever done to address these concerns.  Ultimately, Mr. Proia told Ms. Lee's agent that there was no room for Ms. Lee in a full-time role.  Of course, all those positions were filled with younger women and men.  Upon information and belief, Mr. Bair never escalated this to HR in contravention of Charter policy.

315.    In June 2018, Ms. Lee met with Ms. Rabinovich and Mr. Proia and again told them that she wanted more opportunities to do live news anchoring.  Mr. Proia responded that Labor Day 2018 was his target date for having a revamped anchoring plan ready.  Mr. Proia also confirmed that he wanted Ms. Lee to anchor more often.

316.    Ms. Rabinovich said she wanted Ms. Lee to be fully aware of the "operational commitment [she] would need to make to being a dayside anchor during the week."  Ms. Rabinovich also stated that she did not know how Ms. Lee's anchor commitments could work with her *Spotlight* shoots.

317.    Ms. Lee stated that the *Spotlight* shoots usually took place just once per week, and also explained that she is more experienced than most of the current daytime anchors.  During this conversation, Ms. Rabinovich repeatedly asked which people Ms. Lee believed "should not be there."  While Ms. Lee did not mention anyone by name, the message was obvious – the younger female and male talent was being favored.

318.    In or around August 2018, Ms. Lee spoke to Ms. Rhoney regarding her investigation into the workplace culture.  Ms. Lee reiterated to Ms. Rhoney – just like Plaintiffs and others – that she had been marginalized and mistreated relative to the favored group of younger women and man.

319.     As with every other complaint, Ms. Lee's complaints continue to fall on deaf ears as nothing has been done to remedy this discriminatory environment.  Ms. Lee remains in a junior role with no pathway to success – a stark contrast to the opportunities provided to and created for others.

### F.     Complaints by Ms. Farinacci

320.     Ms. Farinacci has also issued complaints about this mistreatment.

321.     Ms. Farinacci met with Mr. Proia several times to discuss her lack of anchoring opportunities, and noted in particular that she has been passed over for opportunities that went to Ms. Ferry instead.  Ms. Farinacci also complained by email to Ms. Rabinovich about her favoritism towards Ms. Ferry.  Nothing has been done to address Ms. Farinacci's anchoring opportunities.

322.     In October 2018, Ms. Farinacci complained by email to Ms. Rhoney that she had been trying to get these opportunities but to no avail.  Ms. Farinacci did not expressly state that she was being "discriminated against" as she was cognizant that she needed to "tread lightly" since Ms. Rabinovich would not be kind once she learned that Ms. Farinacci had gone to HR.  However, Ms. Farinacci clearly indicated that the environment was riddled with disparate treatment where certain people were provided opportunities and others were not:

> I realize retaliation is a big word and that's not what I'm saying here.  What I do believe is happening is that there are rules being made up as we go along and rules for some people that don't apply to all.

323.     Ms. Farinacci's HR complaint went nowhere.  During the November/December holidays, typically a time when many fill-in opportunities arise, younger talent was given the anchoring desk and Ms. Farinacci was not.  Ms. Farinacci has continued to complain to Mr. Proia

to the present day about not being given opportunities available to others, but still nothing has been done.

324.    Ms. Farinacci has also complained directly to Ms. Reilly, an HR representative in Albany.  In January 2019, Ms. Farinacci called Ms. Reilly to address the fact that she was assigned to attend a "culture meeting" and saw that one of Ms. Rabinovich's friends was in her group.

325.    Ms. Farinacci had asked Brianne Barry (NY1 Senior Production Manager), who was hosting the meeting, to place her in a different group as Ms. Farinacci was concerned that she would not be able to speak freely knowing that everything she said would likely be repeated back to Ms. Rabinovich.  At Ms. Barry's request, Ms. Reilly moved Ms. Farinacci to a different meeting.

326.    However, Ms. Rabinovich learned about the rescheduling and attacked Ms. Farinacci for moving her meeting to a different date; Ms. Farinacci responded to these emails, copying Ms. Reilly so she could see the exchange.

327.    As a result, Ms. Farinacci and Ms. Reilly spoke over the phone and Ms. Farinacci complained about the broad mistreatment she and others had been subjected to by Ms. Rabinovich and her favoritism towards the younger women.

328.    Ms. Reilly told Ms. Farinacci she could intervene with Ms. Rabinovich to ensure that Ms. Farinacci did not need to attend the culture meeting at issue, but Ms. Farinacci just relented and attended the meeting rather than create more strain with Ms. Rabinovich.

329.    The following day, Ms. Reilly called Ms. Farinacci and the two spoke further; ultimately, Ms. Reilly said she felt compelled to escalate her complaints to Suki Balet Parsons

(Ms. Reilly's boss) and that Ms. Parsons would be following up shortly.  However, she never did.

330.     In March 2019, Ms. Farinacci again reached out to Ms. Reilly to ask why she never heard from Ms. Parsons, and Ms. Reilly responded "Let me chat with Suki and circle back with you."  Ms. Farinacci has not heard anything since.

331.     In February 2019, Ms. Farinacci spoke to Mr. Ronayne offsite about the mistreatment she feels she has been subjected to and the opportunities that were not being made available to her at NY1.  Mr. Ronayne promised to "launch an investigation" but said it would take some time.

332.     Several weeks later, in March 2019, Mr. Ronayne informed Ms. Farinacci that he was still looking into her complaints and asked if she was being treated any better.  Ms. Farinacci responded:  "if you mean people have left me alone by means of ignoring me, then yes, things are better, but mostly things are as they were."  Nothing has happened since.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
### *By All Plaintiffs*

333.     Plaintiffs repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

334.     By the actions described above, among others, Defendant has discriminated against Plaintiffs on the basis of gender and/or age in violation of the NYSHRL by denying them the same benefits, terms and conditions of employment as those which are provided to younger women and to men.

335.    As a direct and proximate result of Defendant's unlawful and discriminatory conduct, Plaintiffs have suffered, and continue to suffer, harm for which they are entitled to an award of monetary damages and other relief to the greatest extent permitted by law.

336.    Plaintiffs also seek injunctive relief as may be necessary and appropriate to remedy Defendant's unlawful, discriminatory employment practices.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *By All Plaintiffs*

337.    Plaintiffs repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

338.    By the actions described above, among others, Defendant has retaliated against Plaintiffs based on their protected activities in violation of the NYSHRL by engaging in conduct reasonably likely to dissuade and/or deter Plaintiffs and others from engaging in protected acts.

339.    As a direct and proximate result of Defendant's unlawful and retaliatory conduct, Plaintiffs have suffered, and continue to suffer, harm for which they are entitled to an award of monetary damages and other relief to the greatest extent permitted by law.

340.    Plaintiffs also seek injunctive relief as may be necessary and appropriate to remedy Defendant's unlawful, retaliatory employment practices.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
### *By All Plaintiffs*

341.    Plaintiffs repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

342.    By the actions described above, among others, Defendant has discriminated against Plaintiffs on the basis of gender and/or age in violation of the NYCHRL by denying them

the same benefits, terms and conditions of employment as those which are provided to younger women and to men.

343.    As a direct and proximate result of Defendant's unlawful and discriminatory conduct, Plaintiffs have suffered, and continue to suffer, harm for which they are entitled to an award of monetary damages and other relief to the greatest extent permitted by law.

344.    Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiffs are entitled to an award of punitive damages.

345.    Plaintiffs also seek injunctive relief as may be necessary and appropriate to remedy Defendant's unlawful, discriminatory employment practices.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
***By All Plaintiffs***

346.    Plaintiffs repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

347.    By the actions described above, among others, Defendant has retaliated against Plaintiffs based on their protected activities in violation of the NYCHRL by engaging in conduct reasonably likely to dissuade and/or deter Plaintiffs and others from engaging in protected acts.

348.    As a direct and proximate result of Defendant's unlawful and retaliatory conduct, Plaintiffs have suffered, and continue to suffer, harm for which they are entitled to an award of monetary damages and other relief to the greatest extent permitted by law.

349.    Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiffs are entitled to an award of punitive damages.

350.     Plaintiffs also seek injunctive relief as may be necessary and appropriate to remedy Defendant's unlawful, retaliatory employment practices.

## FIFTH CAUSE OF ACTION
### (Violations of the Equal Pay Act)
### *By Plaintiff Roma Torre*

351.     Plaintiff Roma Torre repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

352.     During Plaintiff's employment, Defendant required Plaintiff to perform the same or substantially the same job position as other male employees, requiring equal skill, effort and responsibility under similar working conditions, and paid Plaintiff at a rate of pay, including salary and bonus, less than such male employees.

353.     Defendant engages in patterns, practices and/or policies of employment which discriminate against Plaintiff on the basis of her gender by paying Plaintiff a lesser rate of pay than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort and responsibility, and under the same working conditions.

354.     As a direct and proximate result of the Defendant's unlawful and discriminatory conduct in violation of the EPA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.  Plaintiff is further entitled to an award of liquidated damages, reasonable costs and attorneys' fees.

## SIXTH CAUSE OF ACTION
### (Violations of the New York Equal Pay Law)
### *By Plaintiff Roma Torre*

355.     Plaintiff Roma Torre repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

356.     During Plaintiff's employment, Defendant required Plaintiff to perform the same or substantially the same job position as other male employees, requiring equal skill, effort and responsibility under similar working conditions, and paid Plaintiff at a rate of pay, including salary and bonus, less than such male employees.

357.     Defendant engages in patterns, practices and/or policies of employment which discriminate against Plaintiff on the basis of her gender by paying Plaintiff a lesser rate of pay than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort and responsibility, and under the same working conditions.

358.     As a direct and proximate result of the Defendant's unlawful and discriminatory conduct in violation of the EPL, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.  Plaintiff is further entitled to an award of liquidated damages, reasonable costs and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendant for the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.     An injunction and order permanently restraining Defendant from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.     An order directing Defendant to place Plaintiffs in the positions they would have occupied but for Defendant's discriminatory and retaliatory treatment and otherwise unlawful conduct, and to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D.      An award of damages against Defendant, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all monetary and non-monetary harm they have suffered, including, but not limited to, compensation for mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering and emotional distress;

E.      An award of punitive damages, in an amount to be determined at trial;

F.      An award of liquidated damages, in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of costs that Plaintiffs have incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiffs' reasonable attorneys' fees and costs to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: June 19, 2019
      New York, NY                       Respectfully submitted,

                                        **WIGDOR LLP**

By: _____
                         Douglas H. Wigdor
                         David E. Gottlieb
                         Julia Elmaleh-Sachs

                         85 Fifth Avenue
                         New York, NY 10003
                         Telephone: (212) 257-6800
                         Facsimile: (212) 257-6845
                         dwigdor@wigdorlaw.com
                         dgottlieb@wigdorlaw.com
                         jelmaleh-sachs@wigdorlaw.com

                         *Attorneys for Plaintiffs*